```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2

 3   UNITED STATES OF AMERICA,)    Case No.
                              )    06-80197-CR-RYSKAMP
 4            Plaintiff,      )
                              )
 5        -v-                 )
                              )
 6   WON SOK LEE,             )
                              )
 7            Defendant.      )    West Palm Beach, Florida
                              )    December 11, 2009
 8   _____)    1:45 p.m.

 9

10                        PAGES 1 - 41

11           TRANSCRIPT OF SENTENCING PROCEEDINGS

12        BEFORE THE HONORABLE KENNETH L. RYSKAMP

13                   U.S. DISTRICT JUDGE

14   Appearances:

15

     For the Government:        STEPHEN CARLTON
16                              Assistant United States Attorney
                                500 Australian Avenue, Suite 400
17                              West Palm Beach, Florida  33401

18   For the Defendant:         SUSAN W. VAN DUSEN, ESQ.
                                2701 South Bayshore Drive
19                              Suite 315
                                Miami, Florida  33133
20                                     -and-
                                SCOTT A. SREBNICK, ESQ.
21                              201 South Biscayne Boulevard
                                Suite 1380
22                              Miami, Florida   33131

23
     Reporter:                  Karl Shires, RPR, FCRR
24   (561) 514-3728             Official Court Reporter
                                701 Clematis Street, Suite 258
25                              West Palm Beach, Florida  33401
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

1          THE COURT:  The next case is United States versus

2     Won Sok Lee.

3          Counsel state their appearances.

4          MR. CARLTON:  Good afternoon, your Honor.  For the

5     United States, Assistant United States Attorney Steve

6     Carlton.  And with me at counsel table is the case agent Paul

7     Wackes, W-A-C-K-E-S, from the FBI.

8          MS. VAN DUSEN:  Good afternoon, your Honor.  Susan

9     Van Dusen together with Won Lee, who is present before the

10    Court, and Scott Srebnick.

11         THE COURT:  All right.  You've reviewed the

12    presentence report with your client?

13         MS. VAN DUSEN:  Yes, sir.

14         THE COURT:  There are no objections, corrections,

15    or omissions?

16         MS. VAN DUSEN:  Your Honor, we had two matters with

17    regard to the presentence investigation report.  And the

18    Court would like me to address that first, your Honor?

19         THE COURT:  Yes.  Have these not been resolved?  I

20    see your request for a variance, but I don't see your

21    objection.

22         MS. VAN DUSEN:  Your Honor, the -- at the back end

23    of our sentencing memo I referenced our objections but, in

24    fact, probably the better way, the easier way is that the

25    probation officer notes that there are two issues remaining

1    unresolved --

2         THE COURT:  All right.

3         MS. VAN DUSEN:  -- in the addendum to the PSI.

4         THE COURT:  Okay.  What are those issues?

5         MS. VAN DUSEN:  Okay.  The first issue is the one

6    that your Honor just made reference to in terms of the

7    request for a downward departure on the two-point increase

8    that Mr. Lee received in his criminal history category.

9         And having covered that in the sentencing memo, I

10   point out to the Court that we're proceeding -- requesting

11   that the Court grant a variance there, downward departure in

12   the sense that that overrepresents Mr. Lee's criminal history

13   similar, if I may, to a request that was made by Yung Kim's

14   lawyer to your Honor at his July 2008 sentencing where Yung

15   Kim had a DUI.  Mr. Lee had a reckless driving for which he

16   received a two-year probationary sentence.  As a result he

17   was on probation at the time of the commission of the present

18   offense.

19        So what I wanted to point out to the Court is that

20   this does not affect Mr. Lee's guidelines.  What it may

21   affect is his designation to a facility.  While the BOP, you

22   know, reviews and has their whole point system for scoring

23   what facility a defendant should be designated to, to the

24   degree that a criminal history category two might affect that

25   designation that's really the motivation behind our request

1  to your Honor.

2          THE COURT:  All right.  Let me hear from the

3  Government on that objection.

4          MR. CARLTON:  Well, with regard to the legal basis,

5  the Government does not believe that there is a reason to

6  depart or to grant the variance.  The category two under the

7  law and the guidelines was appropriately applied.  We did not

8  object to it with regard to the similar situation with Yung

9  Kim because, frankly, the Government was filing a 5K1.1

10 motion which the Court granted, and I frankly viewed it as

11 moot.  So I didn't draw a line in the sand and make a big

12 deal about it.

13         But it's important to note that the argument

14 presented by able counsel, although in good faith, as a

15 practical matter this defendant fled from the United States

16 and did not return and was extradited from South Korea.  So

17 he's likely to get a very high security classification.  And

18 to suggest that the criminal history category two might

19 result in something less than what should be a proper very

20 high security classification frankly may not be very

21 practical.

22         So for those reasons we would oppose it.  It's

23 obviously in the Court's discretion, but frankly we oppose

24 it.

25         THE COURT:  Well, I don't see any exceptional

1  circumstances here so I'll deny the request to reduce the two

2  points.  You can still argue your departure request, but I'll

3  leave the two points on for the offense occurring while on

4  probation.

5          MS. VAN DUSEN:  Yes, sir.

6          Your Honor, the final matter that remains

7  unresolved in the PSI relates totally to the issue of the

8  funds, that we submitted to the probation officer what we

9  offered were two paragraphs which we believe factually set

10  forth, correctly set forth the whole situation with regard to

11  the funds in this case.  The probation officer is obviously

12  leaving it to the Court with regard.  We're just at an

13  impasse.  And that impasse is really reflected in the

14  response that the Government filed to our sentencing memo.

15  So if the Court would just permit me, I want to address this

16  issue of these funds, your Honor.

17          THE COURT:  All right.

18          MS. VAN DUSEN:  The Government believes, if you

19  boil everything down, that Won Lee has the ability to make

20  restitution.  They are seeking 300 months, the 25 years set

21  forth in the plea agreement, based on the fact that they

22  believe he has those funds and that he is continuing to not

23  disclose those funds.  What I would like to do, really beg

24  the Court's indulgence, is to just engage in a slight

25  recounting of events that have unfolded in this case.

1    From day one, in April of this year, when I came

2  into this case and appeared before the magistrate for

3  Mr. Lee's arraignment and then met after that court

4  appearance with Mr. Carlton for the first time, Mr. Carlton

5  made it clear to me that they had records which demonstrated

6  that approximately $3.5 million had been transferred from

7  overseas accounts into accounts in Seoul, South Korea, and

8  then taken out of the South Korean account, and those are the

9  funds that he made it absolutely clear to me that the

10  Government wanted.  And if Mr. Lee could not produce those

11  funds, then any discussions relating to a plea agreement --

12  because I made it clear to Mr. Carlton at the first meeting

13  that this was going to be, as we say, this is going to be a

14  plea.  What he made equally clear to me was this may be a

15  plea, but we're going to take a very hard position unless we

16  get that $3 million.

17    I obviously went to Mr. Lee.  He explained to me

18  the circumstances that he did not have those funds.  At that

19  point he -- through communicating with his parents there

20  were, I would say, almost daily phone calls to the individual

21  in South Korea to whom Mr. Lee had entrusted those funds

22  begging him to please make good on that.  Now, I should also

23  mention to the Court that Mr. Lee has written a memo, which

24  is attached to our sentencing memo as Exhibit M, where he

25  sets forth the entire history of how he came to turn these

1  funds over to another individual and over the course of the

2  four years all of those funds were squandered by that

3  individual who has subsequently declared bankruptcy and is in

4  all kinds of physical situations in South Korea.

5          The parents of Won Lee traveled to Korea in July of

6  this year to confront this man, to confront his family with

7  regard to the jeopardy in which he had placed their son.  The

8  entire response of this man's family was that they didn't

9  have the money, they wished they could do something but that

10  he was utterly bankrupt.  And there was some discussion as to

11  whether, you know, maybe some day he could get back on his

12  feet.

13          And at that point I then had to report to

14  Mr. Carlton that we were unable, you know, to obtain these

15  funds, and we proceeded from there with Mr. Carlton taking

16  the position that it was total -- as he does in his

17  sentencing memorandum, in my opinion, that he found it to be

18  incredible that an individual of Won Lee's background would

19  have entrusted the funds -- which, by the way, your Honor, we

20  stipulate that he had those funds offshore and that he

21  transferred them to South Korea.  We have no issue with the

22  Government and are in complete agreement with their numbers

23  and their accounting.  The only disagreement we have with the

24  Government is that Won Lee does not have access to those

25  funds.

In terms of the plausibility of -- in Mr. Carlton's argument that it's implausible to him that an individual such as Won Lee would have entrusted his funds to what he did not understand was an individual who had known the Lee family for over 30 years, was the equivalent of a brother to Won Lee's father, and was an individual to whom he turned to give his funds to because he didn't have access to them through the bank and because he didn't have an alien registration card in order to access those funds and use them for investments, so the logical thing was for him to turn to this family friend.

As I said, the parents went to Korea. They confronted this man. There was no success.

At that point, after we had the plea in this case, Mr. Lee sat down with the Government and the agents and allowed himself to be completely debriefed. He told again what had happened. Again, Mr. Carlton expressed disbelief at this explanation.

At that point we obtained what we could in terms of bank records from Korea which demonstrated that of the funds that went into the bank account in Korea, we were able to show the transfer out of 2.2 -- the equivalent of 2.2 US -- $2.2 million US into the accounts of this Mr. Oh and his business partner. We also provided to Mr. Carlton the equivalent of an affidavit from Mr. Oh explaining what had happened with his businesses, the downturn in all of his

1  ventures, and the fact that he was totally bankrupt now and

2  completely devastated that he had put the Lee family in this

3  situation.

4  The Government is essentially asking us to prove a

5  negative, which is, that he doesn't have access to the funds.

6  Given the records that we were able to get we felt like we

7  were at least being able to show Mr. Carlton the transfer of

8  that money to the man who ultimately lost it all.  This was

9  the best we could do in terms of the records that are

10  available over events that occurred in March of 2005.

11  What I would say to the Court is that while

12  Mr. Carlton claims that it's not plausible that Won Lee would

13  have turned this money over, he has no hard evidence, no

14  proof that he did not turn it over.  I would say, if you want

15  to talk plausibility, that when Won Lee was facing the

16  Government demanding that he would be pleading to counts

17  which would put him in jail unless he came up with some

18  ability to make restitution, that it is implausible that he

19  would not -- if he had those funds that he would have not

20  produced them.

21  That money does him no good 25 years from now.  His

22  parents are financially completely well off.  They have no

23  need for those funds.  His father has worked for 30 years in

24  this country.  They own their home free and clear.  They have

25  no need for these funds.  They're completely comfortable.

1    These funds would do Won Lee no good in 25 years.  If he ever

2    had a motivation to go, as we sometimes say in the trade, dig

3    up the box in the backyard, that would have been the

4    motivation.  He couldn't do it because he doesn't have the

5    funds.  So we are really at an impasse with the Government in

6    terms of our view of what happened to the money.

7         As a final note to your Honor, in looking at this

8    together with my co-counsel Mr. Srebnick, we finally --

9    knowing that we had produced the documents that we could, I

10   communicated with Mr. Carlton and offered to have Won Lee

11   take an FBI administered polygraph asking Mr. Carlton that,

12   please, do this.  We have no other way to prove this negative

13   to you.  So, please, polygraph our client.  Mr. Carlton can

14   speak for himself, but he chose not to respond, you know, to

15   that offer.

16        That's where we are, your Honor, in terms of the

17   information that was set forth in Paragraph 78 of the PSI

18   which talked about the fact that Won Lee had taken this

19   money, which we don't dispute, but indicated that he had made

20   no efforts to pay it back.

21        I offered substitute paragraphs in lieu of what the

22   PSI stated.  And that's where we stand in terms of the

23   objections to the PSI, that we have paragraphs that we would

24   like inserted which we believe set forth exactly what's

25   happened here in a factually correct manner.  So just in

1    terms of addressing the presentence investigation report,

2    your Honor, that's where we are.

3            THE COURT:  Well, this is rather incredible.  I

4    mean, the man steals millions of dollars and then when you

5    ask him to produce it he says, well, I'm sorry, I don't have

6    it.  If he said somebody stole it from him, he could bring

7    charges.  But if he says I gave it to somebody to invest and

8    they just lost it, there's no criminal act there.  So

9    everybody walks away.  And what about the people who money

10   was stolen?  I find it a rather incredible statement also.

11           He knows how easy it is to con people.  And he's

12   going to give it to somebody else and let them con him?  I

13   mean, come on.  I mean, he just got through stealing it from

14   these people.  Now he's going to let some other person steal

15   it from him?  I just don't buy that.

16           Mr. Carlton, do you want to respond to that?

17           MR. CARLTON:  Just very briefly.  I had showed a

18   chart that basically outlines -- and I don't want to waste

19   too much of the Court's time, but I would like to move in for

20   the sentencing, for the Court to take a look at at least,

21   it's a Government Exhibit 1.  It's a fairly easy tracing of

22   money in a graphic format that I would like to offer to the

23   Court if I could.  I've already given it to defense counsel.

24           THE COURT:  All right.

25           MR. CARLTON:  And before I refer to it on the

1  record, I would like to offer it as Government Exhibit 1 for

2  purposes of this sentencing.

3      THE COURT:  All right.  That will be admitted.

4      (Received in evidence Government's Exhibit(s) 1.)

5      MR. CARLTON:  This is summary chart, your Honor, of

6  funds that the defense stipulates were obtained by fraud by

7  the defendant.  The first page shows transfers from the

8  defendant's personal Bank of America account which contained

9  moneys stolen from the KL investors.  Transfers began as

10  early as March of '04 to Switzerland continuing through the

11  fall of '04 to Switzerland.  In the August of '04 transfers

12  from the United States Bank of America account of Won Lee to

13  the Philippines.  Transfers in September of '04 to Thales

14  Securities in Panama.  And then in October of '04 and

15  February of '05 transfers to the benefit of a company in

16  Canada.

17      The second page relates the Government's further

18  tracing once we received the Swiss records through a mutual

19  legal assistance treaty request that took some time.

20  Switzerland provided the records which showed that the

21  defendant caused moneys that were in the Swiss accounts to be

22  sent Antigua, down in the Caribbean, to Latvia in relation to

23  an international debit card, and finally to numerous banks in

24  South Korea.  All of those occurring between November of '04

25  and April of 2005.

1         THE COURT: On the South Korea it says "Multiple

2 Banks, Nam Lee, Nam Soon Kim." Who are they?

3         MR. CARLTON: Nam Lee I believe is a -- that's his

4 mother and an aunt of the defendant.

5         THE COURT: So the mother knew that --

6         MR. CARLTON: Well, we don't have -- we do not have

7 proof that she had actual knowledge that the funds were

8 stolen, but certainly significant amounts of money were

9 transferred from her son's account into her account and her

10 sister's account in South Korea.

11         The next chart also demonstrates wire transfers

12 from Switzerland in February of '05 around the time that the

13 defendant fled when the SEC began investigating. A $325,000

14 wire transfer to Antigua to the Global Bank of Commerce in

15 the name of a company called to Northview Funding. It's

16 important for the Court to know that Northview Funding was

17 set up in 2003. It was set up around the same time and, in

18 fact, the -- there were two separate companies that were set

19 up in the Caribbean that were specifically set up by this

20 defendant in or around June of 2003 before anyone had an idea

21 that KL was a massive fraud.

22         The way that they fooled everybody was to provide

23 counterfeit documents to an attorney named Ronald Kochman

24 here in Palm Beach County. This defendant was the person

25 that created those counterfeit documents. At the same time

that the original huge counterfeit scheme was being set in

motion, this defendant, different from Jung Kim and different

from Yung Kim, the two other people, this defendant was

setting up sham companies in the Caribbean that he then used

to launder his personal profits.  Jung Kim and Yung Kim never

had a dime outside of the United States that the Government

could find.  This defendant did.  This defendant began

planning his escape in 2003, two years before anybody knew

this was a fraud.  That's what makes him very, very different

in this case.

And the very last chart continues the flow of

money.  On or around the time that the defendant fled the

United States he had moved money from the US to

Switzerland -- to Antigua.  And around the time he fled from

the United States, between January and April of 2005, he

caused approximately $1.36 million to be transferred by wire

transfer from Antigua to Panama, Thales Securities, it was a

Brokerage account.  He also moved more than a million dollars

to various banks in South Korea, and a smaller $13,000

transfer to Latvia.

The Government did not discover this in a timely

basis because all of these transfers occurred in foreign

countries.  The United States had to pursue treaty requests

with Switzerland, Antigua, Panama, and South Korea.  And as a

result of that we have finally noticed through the bank

records that in South Korea, years after the defendant had

fled, in fact about two million dollars was withdrawn from

South Korean bank or banks, a series of $100,000 checks.

Those checks, once they were cashed, the money trace

evaporated.

So the reason why the Government is incredulous as

to the defendant's explanation, one, the long-term planning

to set up these accounts.  He didn't even share this

information with his coconspirators Jung Kim and Yung Kim.

They not only were not on the bank accounts, they knew

nothing about these international accounts.  What is

incredulous about it is that when this -- the amount of

activity that it took and planning in using all of these

different countries, that he would then all of a sudden after

three or four years -- frankly, nine years of being involved

in a huge swindle, he would give up his well-thought booty to

some person in South Korea who he doesn't -- who he claims he

trusts, it just doesn't make sense.

What's not here is -- okay.  The money is seen

going into the bank accounts of this person.  Why aren't

the -- why weren't the records produced by the defense, if

they're willing to cooperate, that shows the money coming out

in South Korea and that it was transferred to a gambling

casino in Macau or some other place.  It goes in -- and they

have those records because -- incidentally -- coincidentally

1    that's what the United States got with the mutual legal

2    assistance treaty response from South Korea.  What we don't

3    see is what happened to the money once it went into those

4    accounts.  It just vanished.

5         Where are the defendant's parents to corroborate

6    this story?  They are not even here today.  Even if they

7    could offer, it's double hearsay.  That would be better than

8    their absence.  The story, quite frankly, is -- it is

9    absolutely incredulous.

10        And quite frankly, the -- whether the PSI on this

11   paragraph is amended or not matters not a bit because it

12   doesn't affect the guideline range.  So it's kind of silly to

13   make a mountain out of a mole hill.

14        This defendant was the only one to have fled from

15   the United States.  He fled the day or the next day after the

16   SEC showed up in California.  His parents were, in fact,

17   involved in helping his escape.  We have the credit card

18   records indicating that they charged gas traveling between

19   Las Vegas and Los Angeles the day or the day after the SEC

20   showed up, and they were involved in helping him hide these

21   moneys.  This was an extremely complicated tracing of funds.

22        I'll reserve any additional comments to respond to

23   the Court's inquiries.  But I think that this defendant in

24   the wake of what he has done here does not deserve any break

25   at all.  Of course the Court has discretion under the law to

grant a departure.  Of course the Court has discretion to

reduce a sentence for acceptance of responsibility.  But

under these circumstances with a defendant fleeing, the

defendant setting up tons of accounts in four or five

different countries and then when caught -- and certainly he

didn't come back to surrender.  He was caught trying to fly

from Saul Korea to Buenos Aires, Argentina, he would never

have come back if hadn't made a mistake.  And he would have

continued access, in the Government's opinion, to all of this

money.

And as an attorney he's been licensed since 1996.

That's 13 years.  His participation in this fraud started in

2000.  Nine of his 13 years as an attorney were spent

orchestrating and planning how to commit the fraud and then

how to hide his participation and how to conceal his profits

from that fraud.  So there's no -- there's no question, this

is not an aberration.  This is a socio path with a law

degree.

He does not deserve any mercy from this Court.

These investors are never going to get much of this money

back at all.  And to suggest that this defendant tried to get

the money back, it defies common sense in my experience.

So for that reason we urge that the Court impose

the sentence of 300 months.  He got a huge break from the

United States.  If he had gone to trial, his guideline range

would have been life.  But we agreed to let him plead to two

counts.  That caps him at 25 years.  He's not going to serve

25 years even if it was imposed.  He probably would serve

85 percent of that.  He probably is hoping that when he gets

out, he'll have a couple of million dollars to spend the rest

of his life.  I would urge the Court to not let him do that

and give him the full 300 months given what has happened in

this case.

THE COURT:  Are there any victims of this fraud

present here today?

MR. CARLTON:  I believe there might be.

THE COURT:  If anyone wants to be heard?

MR. CARLTON:  I don't think so.

THE COURT:  All right.

MS. VAN DUSEN:  Your Honor --

THE COURT:  Go ahead.

MS. VAN DUSEN:  -- just two points before my

co-counsel, Mr. Srebnick, wishes to address the Court on some

other matters.

No. 1, with regard to Exhibit 1, we don't dispute,

we stipulated with Mr. Carlton, indeed I've communicated that

to him, with regard to the accuracy of this chart.  The issue

is the fact that the Government believes that Mr. Lee has the

ability to make restitution that he has these funds.  Our

position is that he does not have these funds.

1          THE COURT:  Well, I don't know why that is really

2    very relevant.  If he has the ability and he suddenly

3    realizes he's going to get a long sentence, maybe he'll do

4    something.  If he doesn't have the ability, he's still going

5    to do his long sentence.

6          I mean, are you saying I should sympathize with him

7    because he's blown all of the money he stole and, therefore,

8    I ought to depart downward?

9          MS. VAN DUSEN:  No.  No, your Honor.  I'm simply

10   addressing the Government's position of our attempting to

11   respond to their belief that he has access to these funds.

12         THE COURT:  He has already got a deal.  He could

13   have had life.  They let him plead to something that didn't

14   include life.  He's got his deal.

15         MS. VAN DUSEN:  Your Honor, on another topic -- and

16   I don't mean to, you know, by any means embarrass

17   Mr. Carlton -- he mentioned that Won Lee's parents were not

18   here, and I really intended to start in my comments to your

19   Honor by indicating to you that they have had tickets to be

20   here since this date was set in September, that they have

21   asked me to please apologize to the Court for the fact that

22   they are not here.  But what happened was yesterday Mrs. Lee

23   basically had a complete breakdown and has been hospitalized.

24   And her husband who spoke to me yesterday about this felt

25   there was no way that he could leave his wife and did not

1  want to leave his wife.  So I don't, you know, say that in

2  any way to -- but I just wanted to -- when Mr. Carlton

3  mentioned that they weren't here, it frankly reminded me that

4  I had been remiss in not beginning my remarks to the Court by

5  extending to the Court the apologies that Won Lee's parents

6  had asked me to please give to the Court.

7          THE COURT:  Okay.  Thank you.

8          MR. SCREBNICK:  My it please the Court.  We

9  understand that the Court is going to impose a long sentence,

10 a very long sentence.  And the Court has had the benefit of

11 two prior sentencings in this case, one of which was the

12 sentencing of Jung Kim.  And I think that's an appropriate

13 starting point for really the final allocution.

14          The Court understands the conduct that was

15 committed here.  I'm sure there were offshore accounts which

16 is not unusual in any large scale fraud.  Mr. Lee was able to

17 obtain money from the fraud, profit from the fraud.  That's

18 not remarkable for a fraud case.  That's why people commit

19 fraud, because of greed and to be able to profit from the

20 fraud.  And certainly that's what he did.  So the fact that

21 he was able to profit and squirrel $3 million away initially

22 offshore is not anything that takes this outside of a typical

23 fraud case.  He profited from the fraud, and he is going to

24 be punished for it.

25          But when the Court sentenced Jung Kim, who was the

1  lead defendant in the indictment, who was the person who

2  organized the hedge funds and did all of the trading, the

3  Court heard a lot of these arguments and ultimately imposed a

4  sentence of 220 months.

5       And the reason that the discussion here today is

6  relevant about what did Mr. Lee do with the money, does he

7  have money offshore, has he paid restitution is because I

8  think the Government is trying to make the case to the Court

9  that the Court should go higher on Mr. Lee than the 220

10 months that the Court has imposed on Jung Kim who was the

11 co-ringleader of this particular fraud.

12      And so I think the Government has really harped on

13 two points.  No. 1, the alleged fugitivity.  And No. 2, the

14 fact that they believe Won Lee still has money to pay

15 restitution.  And so those -- that's why the Government has

16 made a big deal out of that, because they think those are the

17 two arguments that distinguish Mr. Lee and require a sentence

18 higher than the 220 months that the Court imposed on Jung

19 Kim.

20      Jung Kim and Won Lee were both, you know, the

21 co-lead defendants.  Jung Kim was at the top of the

22 indictment.  Equally culpable according to the probation

23 office.  Both pled guilty.  Neither got credit for any kind

24 of cooperation.

25      But if the Court will recall, at Mr. Kim's

1  sentencing the Court was troubled by one very important fact.

2  Mr. Kim prior to his sentencing, while there was an

3  injunction in the SEC case, committed a violation of the

4  injunction of the freeze order; sold a Porsche, pocketed the

5  proceeds.  Said he was selling property in Korea.  The

6  money -- he had a deal with the receiver to bring 300 some

7  odd thousand dollars back, put it in an account in the name

8  of his wife, and Jung Kim simply squandered that money.  And

9  the Court was aware of that fact at the time of sentencing

10  and it is on the record, there's a discussion about that.

11          And notwithstanding that, Jung Kim actually

12  violated a Court order, violated an agreement he had made

13  with the receiver post SEC receivership and simply flaunted

14  the order and stole that money that was supposed to come

15  directly to the victims was something that the Court

16  considered and after considering all of the evidence the

17  Court imposed a sentence of 220 months.

18          THE COURT:  And the maximum was 240?

19          MR. SCREBNICK:  The maximum was 240, but the Court

20  went below the maximum.  And I think the maximum maybe

21  something that's not that significant here for the following

22  reason.  Obviously we are in a post Booker age.  And I could

23  understand that if the Court had imposed the maximum on Jung

24  Kim at 240, there would be a very good argument that the

25  Court would have gone higher had the maximum been higher.

1 But the Court didn't impose the maximum.  The Court imposed

2 220 months.

3        So I think the real question respectfully is are

4 the differences between Mr. Lee and Mr. Kim such that Mr. Kim

5 deserves -- Mr. Lee deserves 80 months higher, which is what

6 the Government is asking for.  We have actually argued that

7 the differences are such that Mr. Won Lee deserves a lower

8 sentence than Jung Kim.  And let me address the two points

9 the Government makes.

10        First is the issue of fugitivity, the flight.  Now,

11 let's be clear about this.  Mr. Lee left for South Korea.  No

12 question he went to leave so that -- because the heat was

13 being turned on.  We're not disputing that.  But there was

14 not a pending indictment at the time.  So whether you can

15 technically call it fugitivity I don't know.  But he did not

16 violate a Court order in fleeing.  The SEC wanted to talk to

17 him.  He had no obligation to speak with the SEC.  And he

18 just left.  And certainly he left because of the heat.  But

19 he did not violate a Court order, did not leave in

20 contravention of a Court order or violate bond.  So let me

21 just make that clear at the outset.

22        No. 2 is, the Government says he was the only one

23 who fled.  Actually, one of the other codefendants fled, if

24 you call it flight, left as well and ultimately was forced to

25 return.  But so Won Lee was not the only person who left when

1    the heat got on, and yet the codefendant got 70 months, the

2    third codefendant got 70 months in prison.  So, that's really

3    the first issue.

4           The Government says the flight, the fugitivity

5    makes Lee more culpable than Kim.  I think the violating a

6    Court order, having that deal, being jailed for contempt is

7    far more egregious than leaving before there's any Court

8    order in effect.

9           The second point they make is the Government

10   believes that Won Lee has money offshore that he could use to

11   pay restitution.  And I know the Court's heard the argument

12   back and forth on that.  But let's be clear about Jung Kim.

13          Jung Kim had to testify at a deposition, and he

14   claimed he didn't have any money left to pay restitution as

15   well.  If the Court would recall, Jung Kim was receiving

16   money from family members even after the SEC injunction.  And

17   he started investing all of that money, and he claimed he

18   lost all that money as well.  And to my knowledge, Jung Kim

19   hasn't paid a penny of his restitution either.  I know there

20   have been assets that have been seized, but he hasn't

21   voluntarily paid any restitution.  And if I'm wrong about

22   that, I would like to know that.

23          So there's a lot of talk about whether Won Lee

24   still has money, but in terms of whether or not Mr. Lee

25   deserves the same sentence or a slightly less sentence than

1    Jung Kim, the issue is has either one paid restitution.  Both

2    of them have testified and stated that they don't have any

3    ability to pay restitution.  The Court understood that when

4    it imposed sentence on Jung Kim, and the Court imposed a

5    sentence of 220 months.

6            So the purpose of the guidelines, one of the basic

7    goals of the guidelines and the basic goals of sentencing is

8    to ensure uniformity.  The Court has already had before it

9    the lead defendant in the indictment, and the question is

10   should Won Lee really be in that same sort of category.  And

11   I really think that he needs to be in that same ballparks as

12   Jung Kim to maintain uniformity.  There really is not a

13   sufficient basis that the Government has articulated to go

14   beyond 220 months for Won Lee.

15           In our sentencing memorandum we presented to the

16   Court a number of cases from across the country that show

17   that not only within the context of this particular case in

18   uniformity within this case but in terms of national

19   uniformity there are a whole host of white-collar cases

20   involving frauds of similar magnitude, many of which involve

21   losses significant greater than in this case, many of which

22   involve losses where the perpetrator was actually pocketing

23   virtually all of the money that was lost by the investors as

24   opposed to losing it in trading.  The Mark Dryer case --

25           THE COURT:  Well, they traded less than half of the

1    money they received, right?  They received 194 million and

2    traded about 92 million?

3           MR. SCREBNICK:  I think the loss -- I don't

4    remember the exact numbers, but --

5           THE COURT:  Well, whatever it is.  Okay.

6           MR. SCREBNICK:  But in terms of -- I think they

7    stated Won Lee personally profited somewhere between 10 and

8    $13 million, but that just relies on certain records where --

9    he and Jung Kim actually both used American Express cards.

10   They were in Won Lee's name, the cards.

11          But this is not a case such as like the Mark Dryer

12   case where the individual was simply pocketing the money and

13   living with hundreds of millions of dollars.  And Mr. Dryer

14   got 20 years.

15          The Mutual Benefits case that Judge Huck sentenced

16   Peter Lombardi, the president of the company, an $800 million

17   Ponzi scheme, he got a 20-year sentence.

18          Many of the sentences in these white-collar cases

19   have been in the 15- to 20-year range where Courts are

20   beginning to recognize that because the guidelines simply

21   pile number upon number upon number for really the same

22   conduct, that the guidelines often skew the numbers.  And

23   Courts have been less reluctant to simply blindly apply the

24   numbers, which is why obviously we haven't focused on the

25   numbers but focused more so on the conduct and how it relates

1    to Jung Kim.

2         I have set forth a number of the sentences in

3    similar cases, similar frauds of similar magnitude, and most

4    are really within that 15- to 20-year range depending on

5    either the involvement of the defendant, how much he

6    profited, whether it was an accounting fraud, whether it was

7    a fraud that -- a direct fraud where the defendant actually

8    pocketed the money.

9         But I think the sentence that we have requested in

10   this case, which is a sentence of 180 months, when in

11   comparison with the sentence received by Jung Kim, I think it

12   is an appropriate sentence to punish Mr. Lee for his conduct,

13   conduct that he's accepted responsible for regardless of the

14   dispute here about whether he has the money.  I don't know

15   how we can prove that or how the Government could prove it.

16   This money was in South Korea.  It's not easy to get record.

17        The point is, he's accepted responsibility for his

18   conduct.  There's no dispute he hasn't paid restitution

19   similar to the situation with Jung Kim.  And we think the

20   appropriate sentence in this case would be one that is really

21   on par with the type of sentence that the Court imposed on

22   Jung Kim in this case.

23        THE COURT:  All right.  Does the defendant wish to

24   address the Court?

25        THE DEFENDANT:  Good afternoon, your Honor.  Most

1    of what I wanted to address to your Honor is in the letter

2    that I already submitted.  I just want to say that I was

3    wrong.  I take full responsibility for my actions.  I'm sorry

4    that my actions caused pain and suffering to many people,

5    including clients, family, coworkers, friends.  And I'm

6    shamed by my actions.  But I know that I still have a lot of

7    good in me.  And if given a second chance, I know I could

8    still be a contributing member of the society.  And I beg

9    four your mercy, your Honor.  Thank you.

10             THE COURT:  All right.  Thank you.

11             Let me hear from the Government.

12             MR. CARLTON:  It's important for the public record,

13   the Court, and the public to know that the Government's

14   recommendation in this case of a sentence of the statutory

15   maximum of 300 months is not one of vindictiveness.  It's one

16   of rationality based on facts that do, in fact, distinguish

17   this defendant from the conduct of Jung Kim and point out why

18   he deserves a stiffer sentence.

19             Jung Kim was, in fact, listed as the lead defendant

20   in this case.  He essentially was a salesman, a good talker.

21   He needed someone with professional credibility to make this

22   scheme work.  That person, the necessary cog in this machine

23   of fraud that was set up, was Won Lee, a person who not only

24   had a law degree but also had a Series 7 license allowing him

25   to trade.  Jung Kim did not even have a Series 7 license

allowing him to buy and sell stocks on behalf of other

people.  He traded fraudulently through the accounts of

others who worked for KL who did, in fact, have Series 7

licenses.

The criminal genius of how this fraud worked

required the knowing and early participation of Won Lee.  The

way that KL was able to fool all of the investors was that

they interposed themselves between the individual investors

and the clearing firms, the clearing firms where the actual

stock trades would occur who would issue statements on profit

or loss on various stock trades.  Won Lee as an attorney

devised a scheme in cooperation with Jung Kim whereby Won Lee

would actually purchase Shoreland Trading LLC, an existing

broker/dealer.  It had only one client, KL.  Shoreland was

then in privity of contract with the clearing firms so that

all of the trades would go through Shoreland and the clearing

firms.

Won Lee lied to a series of clearing firms about

where the money came from that would allow Shoreland to buy

and sell stocks.  He told the firms intentionally early on

this is all my money, it's all proprietary, I own it, it came

from my family's real estate dealings in South Korea.  And as

proof of that he showed money coming into Shoreland's

accounts from Won Lee's personal bank account.  And so the

clearing firms had no questions that millions were being lost

because the guy is an idiot, who cares, it's his money.

The genius of it was that KL money had been taken by Won Lee out of the accounts that KL had set up. When they put the investors money into KL Bank of America, Won Lee was a signatore on those accounts. He then moved money into his own personal account and then transferred it to Shoreland to convince the clearing firms that everything was on the up and up. When they were losing millions of dollars, it was Won Lee's own money. So no red flags came up.

The brilliance of it was the clearing firm issued their quarterly or monthly statements not to the individual investors but instead to Shoreland. And Shoreland through Won Lee and Yung Kim then created counterfeit investor quarterly or monthly statements to the KL investors. So they put themselves in between the clearing firms where the trades were actually occurring and the individual investors. It was absolutely brilliant if it had worked, and it almost did. Won Lee was the person who orchestrated all of that. Jung Kim was a slick salesman who had neither a college degree nor a Series 7 license.

I do note that Mr. Srebnick correctly pointed out that I overstated the point with regard to flight. Won Lee did, in fact, flee at the same time with Yung Kim. Yung Kim was arrested in JFK Airport in January of '06, shortly after an indictment was returned, in connection with an anticipated

1  surrender and shortly thereafter plea agreement with the

2  United States.  But he did originally flee with Won Lee.  I

3  stand corrected on that point.

4  I respectfully disagree with Mr. Srebnick's

5  attempts to -- or his stated position that the in US contempt

6  of Court is more egregious than what Won Lee did.  Won Lee

7  after he was in Korea, certainly after the indictment was

8  unsealed -- it was common -- that indict was unsealed that

9  listed his name.  And there's been no suggestion to the Court

10 to defense counsels' credit, because I don't think that they

11 would make such an argument because it would be incredulous,

12 it certainly was known to Won Lee when he was in Korea that

13 he was wanted in the United States.  He made zero effort to

14 come back.  None.  So I do not believe that -- the Government

15 does not believe that that analogy is well taken.

16 The nefariousness in setting up the mechanism by

17 which KL investors would not have any means by which to

18 actually verify where their money went rests solely on the

19 shoulders of Won Lee, not Jung Kim.  Jung Kim did not have

20 money offshore with the exception of some moneys moved

21 afterwards on a condo in South Korea.  He did not set up

22 international accounts.  This defendant did.

23 The statement provided post plea with regard to

24 what happened to the money is not worthy of belief.  I don't

25 care if the Government turned down an offer to polygraph

1  somebody.  That is irrelevant.  The story on its own does not

2  make sense.

3       Some criminals believe that crime does pay and some

4  people believe that everybody has their price.  And if the

5  Court is to grant any downward departure or variance in this

6  case under these circumstances, quite frankly, people are

7  going to wonder why.  And it should -- of course the Court

8  has discretion to do it.  I urge the Court not to do it under

9  these circumstances.

10      A message needs to be sent to people that are

11  entrusted with other people's money that when you flee the

12  United States and you take millions of dollars and you force

13  the Government to divert its limited resources to finding you

14  and then when caught present a woefully pathetic excuse, that

15  you should receive the absolute statutory maximum.  Enough is

16  enough.  A message needs to be sent.  This is the case for

17  it.

18      MS. VAN DUSEN:  Your Honor, may I just take a few

19  moments?

20      THE COURT:  Briefly, a couple of minutes.

21      MS. VAN DUSEN:  I feel an obligation to Won Lee's

22  parents.  Just as he's all alone here in Court right now

23  because his parents are not here, not able to be, he's 39

24  years old.  Were the Court to sentence him to 25 years, he

25  will be over 60 years old by the time he's finished his

sentence. And that's including the 15 percent reduction in federal prisons.

As a man over 60 years old, his parents unquestionably will by that time be deceased. As the Court is well aware from the sentencing memorandum we submitted, his only other relative was his brother who was killed in 1990. He has two family members, of which I'm aware, in Korea, both of whom are the same age as his parents. He has nothing when he comes out, and he knows that.

For all of those reasons, your Honor, and really on behalf of his mother and father who have already lost one child, we would just ask this Court to consider our request that he receive a sentence below the maximum, that he have the opportunity where he's still of an age that he could make a contribution. I believe that there will be no repeat of this offense. He will be an older man when he comes out. I submit, contrary to what Mr. Carlton believes, he will have no funds whatsoever.

And for that reason and additionally the reason that in this Circuit under the Rodriguez case there is an acknowledgment given for acceptance of responsibility from the maximum sentence in the same way that your Honor dropped Jung Kim's sentence from the maximum of 240, to which he pled guilty, to 220, in acknowledgment of that, the way the case law in our Circuit addresses that fact.

So in closing just on behalf of Mr. Lee's parents, I wish to make this plea to your Honor that the Court give Won Lee some opportunity to have a life in the future and certainly to be in a position to be released from prison at a point in time where there is at least a chance that his parents may still be alive. Thank you, your Honor.

THE COURT: A 30-year sentence means he's going to do 21 years. He's 39. That means he'll be 60.

MS. VAN DUSEN: No. Your Honor, a 30-year --

(Pause in Proceedings.)

MS. VAN DUSEN: Okay. 25 years means --

THE COURT: Excuse me. I meant 300 months. But 25 years means he's going to do 21 years which means he will be 60 when he gets out if he gets that sentence.

I saw 60 17 years ago, so there's a lot of life after 60. I imagine you could have made the same argument for Bernie Madoff, and he got 150 years. You know he's not going to be able to do his sentence.

The Court has considered the statements of all parties, the presentence report which contains the advisory guidelines and the statutory factors which are 3553.

It's the finding of the Court that the defendant is not able to pay a fine as well as restitution.

It is the judgment of the Court that the defendant, Won Sok lee, is committed to the Bureau of Prisons to be

imprisoned for 300 months.  The term consists of 60 months as
to Count 1 and terms of 240 months as to Count 2; all to be
served consecutively.

It's further ordered defendant shall pay
restitution in the amount of $78,525,567.34.

During the period of incarceration payments shall
be made as follows:  First, if defendant earns wages in a
federal prisons industry's job, then the defendant must pay
50 percent of wages earned toward the financial obligations
imposed by this judgment in a criminal case.  Second, if the
defendant does not work in a UNICOR job, then defendant must
pay a minimum of $25 per quarter toward the financial
obligations imposed in this order.

Upon release from incarceration the defendant shall
pay restitution at the rate of 10 percent of monthly gross
earnings until such time as the Court may alter that payment
schedule in the interest of justice.  The US Bureau of
Prisons, US Probation Office, US Attorney's Office shall
monitor the payment of restitution and report to the Court
any material change in defendant's ability to pay.  These
payments do not preclude the Government from using any other
anticipated or unexpected financial gains, assets, or income
of the defendant to satisfy the restitution obligations.

The restitution shall be made payable to the Clerk
United States Courts and forwarded to the US Clerk's office,

1    attention Financial Section, 400 North Miami Avenue, Room

2    8N09, Miami, Florida, who will forward these funds to the

3    victims on the attached list.

4            Upon release from imprisonment the defendant shall

5    be placed on supervised release for a term of three years.

6    This term consists of three years as to Counts 1 and 2.  All

7    such terms to run concurrently.

8            Within 72 hours of release from the custody of the

9    Bureau of Prisons the defendant shall report in person to the

10   probation office in the district to which defendant is

11   released.

12           While on supervised release the defendant shall not

13   commit any crimes, shall be prohibited from possessing a

14   firearm or other dangerous device, shall not possess a

15   controlled substance, shall cooperate in the collection of

16   DNA, and shall comply with the standard conditions of

17   supervised release including the following special

18   conditions:

19           Defendant shall participate in an approved

20   treatment program for drug and/or alcohol abuse and abide by

21   all supplemental conditions of treatment.  Participation may

22   include inpatient and/or outpatient treatment.  Defendant

23   will contribute to costs of services rendered based upon

24   ability to pay or availability of third-party payment.

25           Defendant shall cooperate fully with the Internal

Revenue Service in determining and paying any tax

liabilities.  The defendant shall provide to the Internal

Revenue Service all requested documents and information for

purposes of any civil audits, examinations, collections, or

other proceedings.

It is further ordered that the defendant file

accurate income tax returns and pay all taxes, interest, and

penalties due and owing by him to the Internal Revenue

Service.

Defendant shall provide complete access to

financial information, including disclosure of all business

and personal finances to the US Probation Officer.

Defendant shall not apply for, solicit, or incur

any further debt included, but not limited, to loans, lines

of credit, or credit card charges either as a principal or

co-signer, as an individual or through any corporate entity

without first obtaining written permission from the United

States Probation Officer.

The defendant shall maintain full-time legitimate

employment and not be unemployed for a term of more than 30

days unless excused for schooling, training, or other

acceptable reasons.

Further, defendant shall provide documentation

including, but not limited to, paystubs, contractual

agreements, W-2 wage and earning statements, and other

1 documentation requested by the US Probation Officer.

2          Defendant shall obtain prior written approval from

3 the Court before entering into any self-employment.

4          Defendant shall submit to a search of his person or

5 property conducted in a reasonable manner and at a reasonable

6 time by the United States Probation Officer.

7          Defendant shall immediately pay to the United

8 States a special assessment of $100 as to each of Counts 1

9 and 2 for a total of $200.

10          Now that sentence has been imposed, does the

11 defendant or his counsel object to the Court's findings of

12 fact or the manner in which sentence was pronounced?

13          MS. VAN DUSEN:  No, your Honor.  But I do have just

14 some housekeeping matters to address at the end.  But as to

15 your Honor's question, the answer is no.

16          THE COURT:  All right.  To the defendant, do you

17 understand you have a right to appeal the sentence imposed?

18 Any notice of appeal must be filed within ten days after the

19 entry of judgment.  If you are unable to pay the costs of an

20 appeal, you may apply for leave to appeal without payment of

21 cost.

22          Do you understand that?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  All right.  Yes.

25          MS. VAN DUSEN:  Yes, sir.  Your Honor, Mr. Lee was

1    arrested in South Korea on February 3rd, 2009, and the

2    presentence investigation report accurately reports his

3    formal arrest in the United States was April 3rd.  So

4    although it's only two months, two months is important when

5    you're in jail, and we would respectfully request that the

6    Court reduce Mr. Lee's -- I can't ask for the Court to give

7    him credit for time served because he wasn't in the custody

8    of the Bureau of Prisons, but in fact he was in the custody

9    of Korean authorities which I believe Mr. Carlton will

10   corroborate.  So we would request that he be given -- credit

11   is the only word that comes to my mind, for those two months

12   when he was held with no bond, he was in a South Korean

13   prison.

14          THE COURT:  Mr. Carlton?

15          MR. CARLTON:  No objection to that.

16          THE COURT:  All right.  We'll reduce it from 300 to

17   298.

18          MS. VAN DUSEN:  Thank you, your Honor.

19          The second issue is that we would respectfully

20   request the Court to recommend that the place of imprisonment

21   for Mr. Lee be FCI Terminal Island in California, your Honor.

22          THE COURT:  California?

23          MS. VAN DUSEN:  Yes, sir.

24          THE COURT:  Well, I'll make that recommendation,

25   but they don't very often pay any attention to it.

1    MS. VAN DUSEN:  We're very well aware it's a space

2  issue and everything else, but it's definitely better to have

3  it than to not have it.

4    THE COURT:  All right.

5    MS. VAN DUSEN:  And final request we would make is

6  that the Court recommend also within its order that the

7  defendant participate in the 500-hour residential drug

8  program offered by the Bureau of Prisons which the probation

9  officer indicated in the presentence report that he would be

10  a candidate for, I think is the best way to put it, and we

11  would ask that the Court recommend that.

12    THE COURT:  I don't remember.  Was there an

13  indicated drug problem here?

14    MS. VAN DUSEN:  Yes, sir.

15    THE COURT:  Mr. Carlton?

16    MR. CARLTON:  Let me check the PSI very quickly.

17    (Pause in Proceedings.)

18    MS. VAN DUSEN:  What paragraph?

19    THE PROBATION OFFICER:  62.

20    MS. VAN DUSEN:  Paragraph 62, your Honor.

21    (Pause in Proceedings.)

22    THE COURT:  This is alcohol, not drugs.

23    MS. VAN DUSEN:  Oh, yes, sir.  Not drugs.  Alcohol.

24    (Pause in Proceedings.)

25    MR. CARLTON:  Given the little history that is

1   here, Judge -- he does have a DUI -- I just don't think it's

2   appropriate.  It's a backdoor method of getting a reduced

3   sentence.  We would oppose it.

4         THE COURT:  Well, I'll make a recommendation.  That

5   doesn't mean they follow it.  You've got to earn your way

6   into that program.

7         MS. VAN DUSEN:  Yes, sir.

8         THE COURT:  But I'll make a recommendation.

9         MS. VAN DUSEN:  Thank you, your Honor.

10         THE COURT:  Anything further?

11         MR. CARLTON:  No, your Honor.

12         THE COURT:  All right.  Thank you.  Court will be

13   in recess.

14     (Proceedings concluded at 2:49 p.m.)

15

16            *    *    *    *    *

17            C E R T I F I C A T E

18     I, Karl Shires, Registered Professional Reporter and

19   Federal Certified Realtime Reporter, certify that the

20   foregoing is a correct transcript from the record of

21   proceedings in the above-entitled matter.

22     Dated this 25th day of January, 2010.

23

24   _Karl Shires_____
     Karl Shires, RPR FCRR

25